**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.: 15-cv-61718-WPD

CECILIA SNYDER, individually and on
behalf of a class of similarly situated individuals,

Plaintiff,

v.

ICARD GIFT CARD, LLC, a Florida limited
liability company, and CASH STAR, INC., a
Delaware corporation,

Defendants.

_____/

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT CASHSTAR, INC'S**
**MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

## I.    INTRODUCTION

Defendant Cash Star, Inc.'s ("CashStar") Motion to Dismiss (Dkt. 84) struggles mightily to present Plaintiff's well-pled allegations of *fact* as "speculative," "conclusory," and "unsupported." (Mot. to Dismiss, Dkt. 84, at 2, 6.)  However, CashStar ultimately cannot dispute the numerous facts pled in Plaintiff's First Amended Complaint (Dkt. 65) ("Complaint") establishing that CashStar can be held vicariously liable for the unauthorized text message marketing conducted by Defendant iCard Gift Card, LLC ("iCard") on its behalf.  Regardless of how CashStar labels Plaintiff's allegations, Plaintiff's Complaint plainly establishes that iCard sells CashStar's gift card products (1st Amend. Compl., Dkt. 65, at ¶¶ 7, 18–20), that iCard utilizes CashStar's system to fulfill customer orders (*id.* at ¶ 17), that CashStar directly profits from any sales of its gift card products made by iCard (*id.* at ¶ 21), and most importantly, that

1

CashStar "directs iCard to market and promote CashStar's gift cards to consumers through advertising campaigns, including the text message advertisements described[.]" (1st Amend. Compl. at ¶ 21.)  These allegations are hardly "conclusory," but are instead specific factual allegations that must be taken as true.

While Defendant attempts to portray its involvement in the unauthorized text messaging activity at issue as simply a "supplier of [the] gift cards" (Mot. to Dismiss at 2), and claims that Plaintiff is just "out to find another pocket," the Federal Communications Commission ("FCC") has ruled that a defendant can be held vicariously liable where, as here, it has directed a third-party to conduct telemarketing on its behalf.  *See In re Joint Petition by DISH Network, LLC for Declaratory Ruling*, 28 FCC Rcd. 6574 at ¶¶ 28, 46 (2013) ("2013 FCC Ruling").[1]  In fact, the FCC took this position specifically envisioning a situation such as here, where "the seller" "avoid[s] potential liability by outsourcing its telemarketing activities to unsupervised third parties" that are "judgment proof[.]" Id. at ¶ 37.  Defendant cannot knowingly direct iCard to market CashStar's products, be aware that iCard was engaging in advertising for CashStar's benefit, reap the profits of iCard's unauthorized telemarketing, and then bury its head in the sand by arguing that iCard was just an "independent contractor."  (Mot. to Dismiss at 4.)

Ultimately, whether an agency relationship exists such that CashStar can be held vicariously liable for iCard's unauthorized telemarketing is a question of fact to be determined at trial.  Furthermore, Plaintiff has pled sufficient facts that go far beyond just "reasonably alleg[ing]" that the text message calls were placed by iCard on CashStar's behalf as the FCC has found sufficient to establish vicarious liability at the pleading stage.  (2013 FCC Ruling at ¶ 46, n. 139.)  Accordingly, CashStar's Motion to Dismiss should be denied.

---

[1] Relevant excerpts of the 2013 FCC Ruling are attached hereto as <u>Exhibit A</u>.

## II.   BACKGROUND

### A.   Procedural History

Plaintiff originally filed her Class Action Complaint against Defendant iCard on August 17, 2015, alleging that iCard sent unauthorized automated text message advertisements to her cell phone, and the cell phones of other putative class members, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(A)(iii) (the "TCPA").  (Dkt. 1 at ¶¶ 15, 17, 23, 29.)  After prevailing on multiple attempts by iCard to dismiss this matter through three separate motions to dismiss (Dkts. 23, 55, 75) and a motion for summary judgment (Dkt. 46), Plaintiff was given leave to amend her complaint to add CashStar as an additional defendant in this suit. (Dkt. 64.)  Contrary to CashStar's efforts to impute an improper motive for Plaintiff seeking leave to amend to add CashStar, and as Plaintiff explained in her Motion for Leave to Amend (Dkt. 60), Plaintiff issued the subpoenas that led to the production of the "Digital Gift Card Distribution Agreement" (the "CashStar Contract") between CashStar and iCard in an effort to obtain relevant information that iCard had refused to produce.  (Mot. for Leave to Amend, Dkt. 60, at 4.)  Indeed, as the allegations in Plaintiff's First Amended Complaint make clear, the issued subpoenas resulted in Plaintiff receiving relevant information identifying CashStar as not just a direct *beneficiary* of the text message marketing campaign, but as an entity that *directed* iCard to undertake such marketing efforts.[2]

---

[2] As for CashStar's insinuations regarding Plaintiff's decision to not attach the CashStar Contract to her Motion for Leave to Amend or to her First Amended Complaint (Mot. to Dismiss at 3), Plaintiff chose not to attach the CashStar Contract because it was produced pursuant to a confidentiality agreement.  Nonetheless, Plaintiff does not object to CashStar's production of the Contract and its citations thereto, and in fact, as discussed further below, invites the Court to study the relevant language that, in part, forms the basis of Plaintiff's allegations against CashStar and establishes CashStar's vicarious liability for the conduct at issue.

### B.    Plaintiff's First Amended Complaint

CashStar's Motion to Dismiss attempts to paint Plaintiff's First Amended Complaint as a haphazard collection of "labels and conclusion[s]" attempting to fit a "round peg into [a] square hole." (Mot. to Dismiss at 2.) However, an objective review of the First Amended Complaint reveals that CashStar eludes many of the relevant allegations of fact that establish its role in the text message marketing at issue. Rather than shoehorning in allegations regarding CashStar's involvement with iCard and the telemarketing at issue, the First Amended Complaint in fact plainly explains the detailed nature of CashStar's relationship with iCard, and how CashStar was involved in the unauthorized automated text messages sent by iCard.

iCard markets and sells gift cards for various stores, restaurants, and other businesses. (1st Amend. Compl. at ¶ 6.) However, iCard does not have relationships with the various businesses whose gift cards it sells. (*Id.* at ¶ 18.) Instead, iCard entered into a contract with CashStar to sell *CashStar's* gift card products, as it is CashStar that actually maintains contracts with the various merchants to distribute and sell their gift cards to the public through retailers such as iCard. (*Id.*) Pursuant to this contract, iCard utilizes CashStar's "API" (Application Program Interface) to connect directly to CashStar's gift card distribution service and sell CashStar's gift card products through iCard's online store and the "iCard Gift Card app" advertised in the text message received by Plaintiff. (*Id.* at ¶ 17.) Accordingly, while iCard sells CashStar's gift cards on its mobile application and online store, these orders are in fact redeemed through CashStar's API, and it is *CashStar* that fulfills the orders and actually delivers the physical and/or digital gift cards to the purchaser. (*Id.* at ¶ 19.) In sum, iCard is simply a seller and marketer of CashStar's gift card products that CashStar makes available to iCard and its customers through CashStar's own API interface. (1st Amend. Compl. at ¶ 20.) CashStar thus

directly profits from iCard's sales of its gift cards and any marketing conducted by iCard.  (1st Amend. Compl. at ¶ 21.)

However, and most importantly, not only does CashStar provide its gift card products to iCard to sell, directly profit from any sales of its gift card products by iCard, and fulfill sale orders taken by iCard on its behalf, but CashStar also specifically "directs iCard to market and promote CashStar's gift cards to consumers through advertising campaigns, including the text message advertisements [received by Plaintiff and the Class members]."  (*Id.*)  While CashStar summarily determines that this is a "conclusory allegation[]" for which "[t]here is no support" (Mot. to Dismiss at 10), as the discussion above makes clear this allegation is supported by the numerous other facts pled in Plaintiff's Complaint regarding how iCard sells and markets CashStar's gift card products, utilizes CashStar's API to sell gift cards, and that CashStar directly profits from iCard's sales.

Furthermore, CashStar fails to explain how this is a "conclusory allegation" and why Plaintiff has to provide any additional factual support given that it is a well-pled allegation of fact that must be taken as true and viewed in the light most favorable to Plaintiff at the pleading stage.  *ICON Health & Fitness, Inc. v. IFITNESS, Inc.*, No. 12-cv-20125, 2012 WL 1120925, at *2 (S.D. Fla. Apr. 3, 2012).  In fact, the Court does not need to look any further than the specific language of the CashStar Contract to determine the outcome of CashStar's Motion to Dismiss. The CashStar Contract specifically creates an affirmative obligation that "iCard '*will* market and promote the [CashStar] Cards via relevant points of contact with Members [e.g., cell phone numbers collected by iCard], including but without limitation [iCard's] sites and current advertising campaigns where appropriate."  (Mot. to Dismiss at 3 (emphasis added); CashStar Contract, Dkt. 85, at 3: ¶5) (filed under seal)).  In addition, the contract also grants iCard a

5

"worldwide license" to use CashStar's logos and name and provides that CashStar may prohibit and control iCard's use of such marks.  (CashStar Contract at 4: ¶5.)

While CashStar seems to suggest that nothing short of Plaintiff presenting direct evidence of CashStar ordering iCard to send text message advertisements will suffice, such evidence is not only in CashStar's possession, but as explained further below, goes far beyond what is necessary to plead vicarious liability at the pleadings stage.

## III.   **ARGUMENT**

Plaintiff agrees that iCard, as the entity that actually sent the unauthorized automated text messages, is the entity *directly* liable for violating the TCPA.  (1st Amend. Compl. at ¶¶ 15–16; Mot. to Dismiss at 6.)  Additionally, Plaintiff is not attempting to hold CashStar liable pursuant to any "aiding and abetting theory" (Mot. to Dismiss at 7–8), a theory of liability not even commonly raised in the TCPA context.  Rather, as the entity that entered into a contract for iCard to sell its gift card products on its behalf, directly profited from iCard's sales and marketing, and in fact specifically directed iCard to market its gift card products, Plaintiff has sufficiently alleged that CashStar can be held vicariously liable under the TCPA for the unauthorized text message marketing conducted on its behalf.  The FCC's binding 2013 ruling regarding sellers' vicarious liability for telemarketing conducted by third-parties on their behalf, as well as subsequent district court rulings from Florida and elsewhere across the country, directly support such a finding.

### A.     **Standard of Law**

When considering a motion to dismiss under Rule 12(b)(6) the court must accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *ICON Health*, 2012 WL 1120925, at *2.  "A court will not grant a motion to dismiss unless the

6

plaintiff fails to allege any facts that would entitle the plaintiff to relief." *ICON Health*, 2012 WL 1120925, at *2.  The pleading standard under Rule 8 does not require "detailed factual allegations" and a complaint needs to only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Most importantly, and as Defendant fails to discuss anywhere in its brief, "in the Eleventh Circuit, the determination of whether an agency relationship exists is a question of fact, and 'summary judgment on vicarious liability is appropriate only in cases where the evidence of the relationship is clear and unequivocal.'" *Shamblin v. Obama for Am.*, No. 13-cv-2428, 2015 WL 1754628, at *6 (M.D. Fla. Apr. 17, 2015) (*citing Legg v. Voice Media Grp., Inc.*, 20 F. Supp. 3d 1370, 1378 (S.D. Fla. 2014); *Johnson v. Unique Vacations, Inc.*, 498 F. App'x 892, 894 n. 3 (11th Cir. 2012)).

## B. The TCPA Provides for Vicarious Liability Against Sellers of Goods for Unlawful Marketing Conducted On Their Behalf

### 1. The 2013 FCC Ruling

As CashStar concedes, the 2013 FCC Ruling established that an entity may be held "vicariously" liable for violating the TCPA even if it was not the entity that actually sent the unlawful text messages.  (Mot. to Dismiss at 8–9; 2013 FCC Ruling at ¶¶ 28, 33–47.)  Although CashStar attempts to minimize the importance of the 2013 FCC Ruling by relegating it to a brief footnote (Mot. to Dismiss at 9, n.3), the reality is that virtually all subsequent district court rulings – including those cited to by CashStar in its brief – cite to the 2013 FCC Ruling. CashStar's efforts to downplay the 2013 FCC Ruling are not surprising, though, as the 2013 FCC Ruling establishes that Plaintiff's allegations in her First Amended Complaint more than sufficiently plead that CashStar is vicariously liable for the unlawful text messages sent by iCard on its behalf.

In its 2013 Ruling, the FCC determined that the TCPA's regulations regarding unauthorized calls to cell phones provide for "vicarious seller liability under federal common law agency principles[.]" 2013 FCC Ruling at ¶¶ 33, 35. The FCC came to this determination envisioning a scenario virtually identical to the one being played out in this matter, where "allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy . . . particularly . . . if the telemarketers were judgment proof[.]" *Id.* at ¶ 37. Following this reasoning, the FCC refused to "limit vicarious liability to the circumstances of classical agency (involving actual seller, or right to control, of the telemarketing call)" and ruled that "[p]rinciples of apparent authority and ratification may also provide a basis for vicarious seller liability[.]" *Id.* at ¶ 40, n.124.

To provide further "guidance," the FCC described various "evidence that may demonstrate that the telemarketer is the seller's authorized representative with apparent authority to make the seller vicariously liable for the telemarketer's [TCPA] violations." *Id.* at ¶ 46. The FCC found that, among other factors, "apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services[.]" *Id.* The FCC also stated that "[t]he ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name . . . may also be relevant." *Id.* In addition, "a seller would be responsible under the TCPA . . . if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and . . . failed to take . . . steps . . . to cease that conduct." *Id.* The FCC further explained

8

that, "[a]t a minimum, evidence of these kinds of relationships . . . should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." 2013 FCC Ruling at ¶ 46. Summarizing its ruling, the FCC stated that while "an action taken for the benefit of a seller by a third-party retailer, without more, is [not] sufficient to trigger . . . liability . . . we see no reason that a seller should not be liable under [the TCPA] for calls made by a third-party telemarketer when it has *authorized that telemarketer to market its goods or services*." *Id.* at ¶ 47 (emphasis added).

Most critical for purposes of deciding CashStar's Motion to Dismiss, the FCC specifically stated that "we stress that nothing in this order requires a consumer to provide proof – at the time its files its complaint – that the seller should be held vicariously liable for the offending call." *Id.* (emphasis added); *see also id.* at ¶ 46, n.139 ("Needless to say, nothing in our ruling requires a consumer to prove at the time of their complaint (rather than reasonably allege) that a call was made on the seller's behalf")).

## 2. District Court rulings

Following the 2013 FCC Ruling, a number of district courts throughout Florida and elsewhere in the country have issued rulings regarding an entity's vicarious liability for telemarketing conducted on its behalf. Crucially, and as once again ignored by CashStar, these rulings – including *every* case cited by CashStar in support of its Motion to Dismiss – have largely been at the summary judgment stage, after allowing the plaintiff a sufficient opportunity to take discovery. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 944 F. Supp. 2d 1226, 1230 (S.D. Fla. 2013), *rev'd in part*, 768 F.3d 1110 (11th Cir. 2014); *Shamblin*, 2015 WL 1754628, at *1; *Legg*, 20 F. Supp. 3d at 1372. This is of little surprise given the FCC's explicit statements

that a plaintiff does not bear the burden of proof of establishing solely on the pleadings the existence of an agency relationship.  2013 FCC Order at ¶ 46, n.139, ¶ 47.  Further, a ruling even at the summary judgment stage may be inappropriate given that "in the Eleventh Circuit, the determination of whether an agency relationship exists is a question of fact[.]" *Shamblin,* 2015 WL 1754628, at *6.

It is also worth noting that out of the three cases cited to by Defendant for support – *Mais*, *Shamblin*, and *Legg* – the courts in *Legg* and *Shamblin* actually <u>denied</u> summary judgment, finding that there was an issue of fact as to whether the defendant could be held vicariously liable.  *Shamblin*, 2015 WL 1754628, at *7; *Legg*, 20 F. Supp. 3d at 1377.  Furthermore, in *Mais*, the court did not actually have the benefit of reviewing the 2013 FCC Ruling, as it was released *after* the *Mais* decision was issued. *See Mais*, 944 F. Supp. 2d at 1243, 1245 (stating that "the Court . . . will employ the statute as written and find that only those who make calls in violation of [the TCPA] may be held liable" and that "Plaintiff also argues that [the defendants] should be held vicariously liable for Gulf Coast's call . . . the Court finds that position inconsistent with the [TCPA's] statutory scheme").  Thus, the *Mais* court's discussion of vicarious liability was mostly *dicta* that is no longer reasonable in light of the 2013 FCC Ruling.  In fact, while CashStar cites to *Mais* as providing that "[t]he United States District Court for the Southern District of Florida has reasoned that the issue of 'control' is key to the determination of whether a party will be vicariously liable for unconsented calls made on its behalf," the *Mais* court assessed vicarious liability based solely on "Florida law," rather than Federal common law as required by the 2013 FCC Ruling.  2013 FCC Ruling at ¶¶ 35, 48.  As a result, the *Mais* ruling is of little to no relevance here, as it focused on evidence of "control" to the exclusion of the various other types of evidence that the FCC has since determined supports a finding of vicarious liability.  *Mais*,

644 F. Supp. 2d at 1243–44; *see Keim v. ADF Midatlantic, LLC*, No. 12-cv-80577, 2015 WL 11713593, at *8 (S.D. Fla. Nov. 10, 2015) ("Though the parties cite Florida law for the elements of joint venture liability, it is federal common law, not state law, that applies to TCPA claims"). In sum, the cases CashStar cites for support are, at best, inapplicable and actually weigh in favor of denying its Motion to Dismiss.

Looking at cases that have actually addressed similar claims at the motion to dismiss stage, it becomes clear that Plaintiff has pled sufficient facts to find that CashStar may be held vicariously liable for iCard's text message marketing conducted on its behalf.  For example, in *Wagner v. CLC Resorts & Developments, Inc.*, 32 F. Supp. 3d 1193 (M.D. Fla. 2014), the plaintiff alleged that two of the defendants contracted with the entity "Passport to assist them with marketing their respective resort and timeshare offers to potential consumers." *Wagner*, 32 F. Supp. 3d at 1195.  The plaintiff further alleged that the telemarketing entity Passport "called him on behalf of [the seller entities] several times[.]" *Id.*  Responding to the plaintiff's complaint, the seller entities on whose behalf Passport placed the calls filed a motion to dismiss, arguing that they cannot be held vicariously liable for the alleged TCPA violations. *Id.* at 1196. The court, however, found that the plaintiff's allegations were sufficient to establish vicarious liability at the motion to dismiss stage under theories of formal authority, apparent authority, and ratification.  *Id.*  Specifically, the court noted that the plaintiff had "alleged that [the seller] contracted with Passport to market to potential consumers on its behalf," that "Passport directed consumers to visit [the seller's] sales offices," and that the seller "ratified Passport's conduct by accepting the benefit of its actions." *Id.* at n.1.

Similarly, in *Keim*, the Southern District of Florida found that at the pleading stage, the plaintiff's allegations that the defendant "'approved or authorized' [the telemarketing entities] to

promote [its] brand" was "sufficient to plead [the defendant's] vicarious liability for [the] alleged TCPA violations." *Keim*, 2015 WL 11713593, at *8.  A similar fact pattern as here was also at issue in *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16-cv-1473, 2016 WL 4651395 (N.D. Ill. Sept. 7, 2016), where the plaintiff received an unauthorized sales call from a "representative of U.S. Education Network." *Mauer*, 2016 WL 4651395, at *1.  Even though the sales call never mentioned the defendants on whose behalf the calls were being placed or used the defendants' names during the attempted solicitation, the court nonetheless found that the defendants could be held vicariously liable under the TCPA.  *Id.* at *3.  The court explained that "[a]gency is typically a factual issue, with the plaintiff at the pleading stage only required to allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts." *Id.* at *2 (citing 2013 FCC Ruling at ¶ 46, n.139).  Accordingly, "at the pleading stage, it is irrelevant that a plaintiff cannot identify . . . what arrangement th[e] third party had with the defendant vendors because the defendants, and not the plaintiff, are reasonably expected to know this information." *Id.* at *2.  While the defendants argued – as CashStar does here – that the plaintiff "makes 'blanket assertions' regarding the possible relationship between [the defendants], and [the telemarketing entity]," the court found that the plaintiff "need only generally allege her agency claim so as to provide each Defendant notice of the claims against them at this stage." *Id.* at *3.

Ultimately, the court in *Mauer* held that the plaintiff had alleged sufficient facts to establish vicarious liability at the pleadings stage.  Specifically, the court found that even though the sales call received by the plaintiff did not in any way mention the defendants, the fact that a subsequent phone call placed by the plaintiff's counsel as part of their investigation to the same phone number resulted in call-backs from individuals who stated that they were calling on behalf

of the defendants, was sufficient to "mak[e] the connection plausible." *Mauer*, 2016 WL 4651395, at *3. The court also noted that it looked to "the existence of [an] alleged contract" between the entities which "aids" in establishing an agency relationship, as well as the fact that the telemarketing entity and the defendants "worked in the same line of business." *Id.* The court in *Shamblin* similarly noted that the formation of a contract between the defendant and the telemarketing entity "is evidence that a finder of fact could use in support of a determination that an agency relationship arose" even if it "contain[s] a disclaimer of any principal/agent relationship." 2015 WL 1754628, at *7.

Finally, the court in *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147 (N.D. Ill. 2014), also dealt with the issue of whether a plaintiff had sufficiently alleged a basis for finding the defendant vicariously liable. In *Charvat* the plaintiff received a telemarketing call from an unidentified entity offering to sell insurance from several different insurance companies. 29 F. Supp. 3d at 1150. After the plaintiff chose to respond to the prompt he was forwarded to a sales agent working on behalf of Allstate, one of the several insurance companies mentioned in the initial prompt. *Id.* The court found that these allegations "sufficiently pled a substantive basis for . . . vicarious liability" against Allstate even though the initial call did not specifically reference Allstate and was not placed by Allstate. *Id.* at 1151. While the defendant argued that the plaintiff failed to "allege 'what arrangement, if any, [the third party telemarketer] had with either defendant,'" the court dismissed these arguments as "meritless," stating that "it is defendants, not plaintiff, who can reasonably be expected to know these facts[.]" *Id.*

As the 2013 FCC Ruling, as well as the numerous cases cited above, makes clear, Plaintiff does not have to allege in her Complaint facts sufficient to overcome a motion for summary judgment and that affirmatively establish that an agency relationship was formed

13

between CashStar and iCard.  In light of that, the allegations in Plaintiff's Complaint are more than sufficient at the pleadings stage.

### C.     Plaintiff's First Amended Complaint Alleges Sufficient Facts to Find CashStar Vicariously Liable for the Unauthorized Text Messages

Whether one looks to the 2013 FCC Ruling, or the numerous district court decisions that have ruled on this issue, it is clear that Plaintiff has more than sufficiently pled the existence of an agency relationship between CashStar and iCard such that CashStar may be held vicariously liable for the unauthorized automated text messages at issue.

Turning first to the 2013 FCC Ruling, the FCC provided a number of guide posts for determining whether an agency relationship may exist that gives rise to vicarious liability. Specifically, as discussed above, the FCC stated that "apparent authority" can be supported by evidence that the defendant allows the marketing entity access to "information and systems that normally would be within the seller's exclusive control" including "detailed information regarding the nature and pricing of . . . products and services."  2013 FCC Ruling at ¶ 46.  Here, Plaintiff's Complaint pleads that CashStar provided iCard access to its API which iCard used to "connect[] directly to CashStar's gift card distribution service."  (1st Amend. Compl. at ¶¶ 17, 20.)  Furthermore, the FCC also stated that "the ability . . . to enter consumer information into the [defendant's] sales or customer systems" is also "relevant" evidence of the existence of an agency relationship.  2013 FCC Ruling at ¶ 46.  Here, Plaintiff's Complaint alleges that iCard had the ability to enter customer information into CashStar's sales system, as the gift cards purchased through iCard's online and mobile stores were "actually redeemed and fulfilled by CashStar, and it is ultimately CashStar that provides the physical and/or digital gift card that is delivered to the customer."  (1st Amend. Compl. at ¶ 19.)  iCard necessarily accessed CashStar's systems in order for CashStar to fulfill iCard's gift card orders.  The FCC similarly stated that the

"authority to use the seller's trade name . . . and service mark" further supports a finding of an agency relationship.  2013 FCC Ruling at ¶ 46.  Here, CashStar specifically authorized iCard to use CashStar's service mark and even provides that CashStar may prohibit and control iCard's use of such marks.  (CashStar Contract at 4:¶5.)

Importantly, the FCC stated in summary that "we see no reason that a seller should not be liable under [the TCPA] for calls made by a third-party telemarketer when it has authorized that telemarketer to market its goods or services."  2013 FCC Ruling at ¶ 47.  Plaintiff's Complaint specifically pleads that "CashStar in fact also directs iCard to market and promote CashStar's gift cards to consumers through advertising campaigns, including the text message advertisements described herein."  (1st Amend. Compl. at ¶ 21.)  Not only is this a well-pled fact, but it is supported by the language of the CashStar Contract itself, which states that, "iCard 'will market and promote the [CashStar] Cards via relevant points of contact with Members, including but without limitation [iCard's] sites and current advertising campaigns where appropriate."  (Mot. to Dismiss at 3; CashStar Contract at 3:¶5.)  Through this language CashStar creates an affirmative obligation for iCard to "market and promote" CashStar's products "via relevant points of contact," such as mobile phone numbers collected by iCard, and including "current advertising campaigns," such as the text messaging campaign at issue.  CashStar cannot simply hide behind the fact that the contract does not contain any language *specifically* discussing text message marketing when it directed iCard to conduct sales and marketing on its behalf—including "current advertising campaigns."  This is exactly why the FCC stated that, "allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy"

and issued its 2013 Ruling allowing for vicarious liability in such circumstances. 2013 FCC Ruling at ¶ 37.

The district court decisions discussed above, including the cases cited to by CashStar, mandate the same conclusion. Plaintiff's Complaint alleges many of the same facts that other district courts in Florida, and elsewhere across the country, have found sufficient to establish vicarious liability at the pleading stage. For example, as in *Wagner*, Plaintiff's Complaint alleges that "[CashStar] contracted with [iCard] to market [iCard's products]." *Wagner*, 32 F. Supp. 3d at 1196; 1st Amend. Compl. at ¶ 21; *see also* CashStar Contract at 3:¶5. In addition, CashStar also accepted the benefits of iCard's actions as it directly profited from iCard's sales of its gift card products. *Wagner*, 32 F. Supp. 3d at 1196 n.1; 1st Amend. Compl. at ¶ 21. Finally, by utilizing CashStar's API, iCard ultimately "directed consumers" to CashStar to have their orders fulfilled—even if iCard never explicitly identified CashStar as the fulfiller of the gift card orders. *Wagner*, 32 F. Supp. 3d at 1196 n.1; 1st Amend. Compl. at ¶¶ 17, 19.

Furthermore, as in *Keim*, Plaintiff has sufficiently pled that CashStar is vicariously liable for the alleged TCPA violation by alleging that CashStar "'approved or authorized' [iCard] to promote [CashStar's products.]" *Keim*, 2015 WL 11713593, at *8; 1st Amend. Compl. at ¶ 21; *see also* CashStar Contract at 3:¶5. In addition, the allegations regarding iCard's sales and marketing of CashStar's gift card products closely track the fact patterns at issue in *Mauer* and *Charvat*. While CashStar appeals to the lack of its corporate name being used in the language of the unauthorized text messages or on iCard's website as evidence that there was no agency relationship formed (Mot. to Dismiss at 12–13), both *Mauer* and *Charvat* involved calls placed on behalf of defendants that were similarly not disclosed as the entities on whose behalf the calls were being placed. *Mauer*, 2016 WL 4651395, at *1; *Charvat*, 29 F. Supp. 3d at 1150. Further,

16

it is worth noting that even though iCard did not specifically reference "CashStar" in its advertising and website content, the CashStar Contract specifically granted iCard a "worldwide license" to use CashStar's logos and name, and provides that CashStar may prohibit and control iCard's use of such marks.  (CashStar Contract at 4:¶5.)  More importantly, in *Mauer* and *Charvat* the telemarketing was conducted by entities that generally promoted a *type* of service on behalf of a specific company with which they had contracted to ultimately forward the customer to.  *Mauer*, 2016 WL 4651395, at *1, *3; *Charvat*, 29 F. Supp. 3d at 1150.  This is identical to the situation here, where iCard was generally marketing "gift cards" through the unauthorized text messages at issue, and then ultimately sold customers CashStar's gift card products that were redeemed and fulfilled *by CashStar*.  (1st Amend. Compl. at ¶¶ 17–19.)

In effect, just as the telemarketers in *Mauer* and *Charvat* did not themselves provide education and insurance services, and forwarded customers to the entities that would actually provide such services, iCard too did not directly have the contractual relationships to sell CashStar's gift cards and ultimately had CashStar fulfill the orders.  Furthermore, as in *Mauer*, Plaintiff has alleged – and indeed, CashStar has produced – a contract entered into between CashStar and iCard (2016 WL 4651395, at *3; Mot. to Dismiss at 3; Dkt. 85), and as in *Mauer* both CashStar and iCard "work[] in the same line of business."  2016 WL 4651395, at *3.  The *Mauer* court found both such facts persuasive in denying the defendant's motion to dismiss.

To the extent that CashStar argues that no agency relationship can be imputed from the CashStar Contract because it "identifies iCard as an independent contractor" (Mot. to Dismiss at 4, 12), numerous courts have held that such clauses are not in any way "dispositive of the issue whether [a principal/agent] relationship was created."  *Shamblin*, 2015 WL 1754628, at *7 (citing *Highline Capital Corp. v. Ahdoot*, No. 06-cv-2024, 2008 WL 486019, at *8 (D.Colo. Feb.

20, 2008) ("courts routinely find such disclaimers only weakly probative of whether such [agency] relationships in fact exist")).  Accordingly, the court in *Shamblin* determined that the formation of a contract between the defendant and the telemarketing entity "is evidence that a finder of fact could use in support of a determination that an agency relationship arose" even if it "contain[s] a disclaimer of any principal/agent relationship."  2015 WL 1754628, at *7.

Finally, and most critical for the purposes of determining this Motion, both the 2013 FCC Ruling and the various district court cases discussed above repeatedly emphasize that a plaintiff does not bear the burden of pleading all of the facts necessary to affirmatively establish a defendant's vicarious liability at the pleading stage.  2013 FCC Ruling at ¶ 46, n.139 ("Needless to say, nothing in our ruling requires a consumer to prove at the time of their complaint (rather than reasonably allege) that a call was made on the seller's behalf")); *Shamblin*, 2015 WL 1754628, at *6 ("in the Eleventh Circuit, the determination of whether an agency relationship exists is a question of fact"); *Mauer*, 2016 WL 4651395, at *2 ("[a]gency is typically a factual issue, with the plaintiff at the pleading stage only required to allege a factual basis that gives rise to an inference of an agency relationship through the use of generalized as opposed to evidentiary facts") (citing 2013 FCC Ruling at ¶ 46, n.139).  Even "*summary judgment* on vicarious liability is appropriate only in cases where the evidence of the relationship is clear and unequivocal." *Shamblin*, 2015 WL 1754628, at *6 (emphasis added) (internal citations omitted).

As set forth above, Plaintiff has more than sufficiently "allege[d] a factual basis that gives rise to an inference of an agency relationship" (*Mauer*, 2016 WL 4651395, at *2): CashStar provided iCard access to its API; CashStar was aware that iCard would be marketing its products (including through current advertising campaigns); CashStar directed iCard to market its gift card products, including creating an affirmative duty for iCard to market its

products through "relevant points of contact"; CashStar authorized iCard to use CashStar's trademarks; and CashStar directly benefited from iCard's sales of its gift card products and any concurrent marketing.  Further, while CashStar certainly "knew" that iCard would be conducting marketing "on its behalf," the extent of CashStar's communications with iCard regarding this text messaging campaign and whether CashStar "reasonably should have known" that iCard was violating the TCPA are still questions of fact to be determined after discovery.  2013 FCC Ruling at ¶ 46.   CashStar should not be permitted to, as the FCC foresaw, contract with iCard to have its products marketed and sold and then reap the rewards of such an arrangement, while leaning on that same contract to disclaim any liability for the activities of an "unsupervised" entity.  2013 FCC Ruling at ¶ 37.

CashStar is free to file a motion for summary judgment and challenge Plaintiff's allegations on the merits following appropriate discovery, and the Parties can brief this issue again at that time.  However, any ruling dismissing CashStar as a party to this suit at this point in the litigation is simply premature.

## IV.   <u>CONCLUSION</u>

For the reasons stated above, Plaintiff respectfully requests that Defendant CashStar's Motion to Dismiss be denied in its entirety.

Date:  March 10, 2017                    Respectfully submitted,

                                         CECILIA SNYDER, individually and on behalf of a
                                         class of similarly situated individuals

                                         /s/ David P. Healy
                                         One of Plaintiff's Attorneys



David P. Healy (FL Bar No. 940410)
Dudley, Sellers, Healy & Heath, PLC
Suntrust Financial Center
3522 Thomasville Rd., Suite 301
Tallahassee, Florida 32309
Tel: (850) 222-5400
Fax: (850) 222-7339

Eugene Y. Turin (*pro hac vice*)
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, Illinois 60601
Tel: (312) 893-7002
eturin@mcgpc.com

*Attorneys for Plaintiff and the proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2017, I electronically filed the foregoing *Plaintiff's Memorandum of Law in Opposition to Defendant CashStar, Inc.'s Motion to Dismiss for Failure to State a Claim* with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to the following counsel of record:

Nolan Keith Klein
Law Offices of Nolan Klein, P.A.
Wells Fargo Tower
One East Broward Blvd., Ste. 1500
Ft. Lauderdale, FL 33301
klein@nklegal.com

Alan E. McKenna
Stevenson McKenna & Callanan, LLP
350 Lincoln St., Ste. 2400
Hingham, MA 02043
amckenna@smcattorneys.com


                                        /s/ David P. Healy